Eastern District of Kentucky
FILED
SEP 0 7 2006
AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE

CIVIL ACTION NO. 05-373-GWU

DONNA WHITE MAYNARD,              PLAINTIFF

VS.        **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY      DEFENDANT

## INTRODUCTION

Donna White Maynard appeals from the negative administrative decision on her application for Child's Supplemental Security Income (SSI) benefits. The case is before the Court on cross-motions for summary judgment.

## LAW APPLICABLE TO CHILD'S SSI BENEFITS

As of 1996 <u>strict</u> standards for child's SSI claims were adopted. The Welfare Reform Act, P.L. No. 104-193, 110 Stat. 2105, provides that:

> An individual under the age of eighteen (18) shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months.

Thus, a child's SSI claim can be granted now only if there is a "marked and severe functional limitation(s)." The impairment must meet, medically equal, or functionally

Maynard

equal in severity one of the Listing of Impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 2. 20 C.F.R. Section 416.924.

The implementing regulations require the agency to determine if the child's impairment(s) meet any Listing of Impairments sections found at 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. Section 416.924. If this step is not satisfied, the fact finder is required to consider limitation of specific functioning, broad areas of development or functioning, episodic impairments, and limitations related to medication effects to determine "functional equivalence" to the LOI. Section 416.926a. Functional equivalence is established if the child has one area of extreme functional limitations (i.e., very serious interference with functioning) or two areas of marked limitation (i.e., serious interference with functioning). Id.

## DISCUSSION

The administrative law judge (ALJ) found that Maynard suffered from diminished vision, attention deficit hyperactivity disorder (ADHD), a depressive disorder with anxious and borderline personality features, a learning disorder in language arts (expressive reading), and a mathematics disorder (sixth grade level). (Tr. 13). He concluded that none of the impairments satisfied Listing of Impairment section criteria. (Tr. 15). She was also believed by the ALJ to have no "marked" or "extreme" limitations in any functional domain. (Tr. 15-17). Thus, her claim for benefits was denied. (Tr. 17).

Maynard

As far as the plaintiff's physical status is concerned, the few medical records document some conditions such as reflux esophagitis (Tr. 162), acute sinusitis on one occasion in 2002 (Tr. 167), and headaches in 2000 (Tr. 240-241), but with no documented comments about permanent functional restrictions associated with them. Moreover, Medical Advisors Dennis Penn and Joanne Sexton indicated that the physical complaints were not "severe". (Tr. 169, 175). Thus, functional domains such as "Health and Physical Wellbeing" and "Moving About and Manipulating Objects", considered in assessing whether the plaintiff's conditions functionally equalled a Listing of Impairment Section, need not be seen as limited.

Her parents completed a Child Behavior Checklist for the 15 year old plaintff in May, 2003 (Tr. 115). She reportedly spent more time than a typical child four-wheeling and singing, and did above average at each. (Id.) Her swimming, dancing and babysitting skills were described as average for her age. (Id.). She had "4 or more" close friends and got along better than average with her siblings and other children. (Tr. 116). Her reading, English or Language Arts ability at school, as well as Science and Health grades were average, but mathematics and social studies were below average; however she did not, at that time, receive remedial services or classes. (Id. ) She did not lie, cheat, steal or get teased by other children. (Tr. 117-118).  The results of this questionnaire did not indicate severe functional restrictions, albeit other subsequent information from the school system, however, does not present such a rosy picture, especially of the plaintiff's conduct.

Maynard

School discipline records for 2001 and 2002 show multiple instances of infractions such as skipping classes. (Tr. 131-132, 146-147). However, in 2003, it appears that the infractions became more serious, and included instances of classroom misbehavior and destruction of property (Tr. 131-132).

In May, 2003, a teacher completed an Abbreviated ADHD Symptom Checklist indicating that the plaintiff did not have difficulty remaining seated, talk excessively, destroy others' property, steal items or act fearful, anxious or worried. (Tr. 121-123). However, the pupil often had difficulty sustaining attention, did not seem to listen, and was easily distractible and forgetful. (Tr. 121-123). She had difficulty completing homework and following directions or rules. (Tr. 123).

A Parent Referral Sheet from the school in November, 2003 indicated that the plaintiff was refusing to complete homework and was not taking it home. (Tr. 133). All teachers had reportedly stated that the child <u>had</u> the ability to do work at grade level. (Id.). She was being treated at the Mountain Comprehensive Care Center and had been to Ridge Behavior Institution. (Tr. 134). She was reportedly disrespectful to her parents, did not get along with friends or siblings and had limited self-control at that time (Id.), conduct which contrasted somewhat with her parents' earlier description of her behavior.

School records show that multiple suspensions were assessed for the plaintiff in late 2003 (Tr. 142-144) and in December, 2003, a Juvenile Petition was

Maynard

filed in the state court system indicating, based on information provided by the high school, that the plaintiff was out of control. (Tr. 156).

In early 2004, other information from the school suggested that the plaintiff's attitude was not cooperative. As part of the Progress Report from the Martin County Alternative Placement Center that the child never seemed eager to learn, or to participate in class activities, fully complete her homework, remain on task or attend class regularly. (Tr. 130). "Sometimes" she showed respect for others, cooperated in class and followed rules of conduct. (Id.) A teaching assistant noted that she had a higher than normal rate of absenteeism and suspension (Tr. 148) and "seemed uninterested in classwork and those around her" and although "very bright she just refuses to do what she is supposed to" (Tr. 149). The child apparently wished to associate with certain peers in the behavior disorder class, rather than her own classmates. (Tr. 150). Her most serious problems were seeking attention inappropriately, not following rules, and respecting/obeying authority figures. (Tr. 150).

Thus, information from the school systems points to abnormalities in conduct, particularly in 2003 and 2004, and attention and attitude problems, but not necessarily intellectual problems. Information from a treating source (Tr. 227), a consultative examiner (Tr. 246) as well as a one-time examiner (Tr. 234) suggested average intelligence, although the one-time examiner alone mentioned borderline

Maynard

ability with regard to Verbal IQ (Tr. 234). Viewed as a whole, the ALJ could properly conclude that the plaintiff's difficulties did not involve any significant IQ deficiency.

Psychologists variously diagnosed the plaintiff's problems in 2003 and 2004 as: (1) an Oppositional Defiant Disorder or a Conduct Disorder as well as possible ADHD (Tr. 191), (2) a Disruptive Behavior Disorder and a Parent-Child Relational Problem (Tr. 198, 201, 205, 209), (3) a polysubstance abuse disorder, a possible substance-indicued mood disorder and a history of ADHD, (4) a severe Oppositional Defiant Disorder, an Attention Deficit Disorder, a Depressive Disorder and a history of Polysubstance Abuse (Tr. 235), (5) ADHD, polysubstance abuse of unknown current status, and disorder of adolescence (Tr. 248), and (6) a disruptive disorder, physical abuse of child, an anxiety disorder, polysubstance dependence and a Parent-Child Relational Problem (Tr. 256). To the extent that GAF levels were given, they indicated no more than moderate symptoms (Tr. 209, 227, 229, 248), except for the one reported by One-time Examiner Eric Johnson (Tr. 235). Of the two examining sources who completed assessment forms, both were of equal weight; thus, the ALJ could have relied upon the opinion of Dennis Sprague indicating "mild to moderate" impairment or "limited but satisfactory" ability in a variety of mental functions (Tr. 248, 250-251).

Not only is the latter's assessment consistent with "less than marked" restrictions in the remainder of functional domains, but the last Mountain Comprehensive Care Center treatment notes suggest fewer restrictions in that, e.g.,

Maynard

the plaintiff was getting married, she had kept her grades up to "passing" level, no behavior problems were evident at school, and she was hoping to take her driver's permit test. (Tr. 254-255).

The decision will be affirmed.

This the 7 day of September, 2006..

G. WIX UNTHANK
SENIOR JUDGE